UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiffs,<br><br>v.<br><br>SHAW ENVIRONMENTAL & INFRASTRUCTURE, INC., et al.,<br><br>Defendants. | Case No. 14-cv-01509-SK<br><br>**ORDER ON PENDING MOTIONS TO DISMISS**<br><br>Regarding Docket Nos. 79, 125 |

This matter comes before the Court upon consideration of the pending motions to dismiss filed by Defendants Shaw Environmental & Infrastructure, Inc. ("Shaw"), Chicago Bridge & Iron Company N.V. ("Chicago Bridge and Iron"), Aptim Federal Services, LLC, and Aptim Corporation (collectively, "Shaw Defendants"). Having carefully considered the parties' papers, relevant legal authority, and the record in the case, the Court hereby grants the pending motions for the reasons set forth below.

**BACKGROUND**

Relator Kevin McLaughlin ("McLaughlin") first filed this *qui tam* action against the Shaw Defendants, as well as other defendants, on April 1, 2014. (Dkt. No. 1.) McLaughlin's initial complaint only alleged fraud under the False Claims Act, 31 U.S.C. §§ 3729-3733, with respect to work performed at the former naval shipyards at Hunters Point. On February 21, 2019, McLaughlin amended his complaint to include allegations regarding the work done at Treasure Island. (Dkt. No. 23.) On February 27, 2020, McLaughlin filed the operative complaint – his Third Amended Complaint ("TAC"). (Dkt. No. 61.)[1]

---

[1] The Shaw Defendants request that the Court consider three exhibits as documents as incorporated into TAC. (Dkt. Nos. 124-3, 124-4, 124-5.) However, while those documents may

1   This *qui tam* case was related to a large group of cases brought challenging the work by government contractors to remediate the radiation contamination in the soil at the former naval shipyards at Hunters Point and Treasure Island. This case was separated from the other cases and reassigned to the undersigned on September 8, 2023, with motions to dismiss pending. The Shaw Defendants joined in motions to dismiss filed by other defendants on certain legal grounds and also moved own their own to dismiss the TAC. (Dkt. Nos. 125, 126.) The Shaw Defendants joined in the motion to dismiss on statutory grounds filed by other defendants filed at Docket Number 79. (Dkt. No. 126.) Judge Donato dismissed McLaughlin's TAC on first-to-file grounds and did not address the other arguments raised. (Dkt. No. 193.) However, Judge Donato then granted McLaughlin's motion for reconsideration and re-opened McLaughlin's case. (Dkt. No. 205.)

The parties agree that the Court should address the arguments raised by the other defendants regarding the statutory public disclosure bar in Docket Number 79 (which the Shaw Defendants joined through Docket Number 126) and the Shaw Defendants' motion to dismiss for failure to state a claim in Docket Number 125.

**ANALYSIS**

**A.  Applicable Legal Standard on Motion to Dismiss.**

A motion to dismiss is proper under Federal Rule of Civil Procedure 12(b)(6) where the pleadings fail to state a claim upon which relief can be granted. On a motion to dismiss under Rule 12(b)(6), the Court construes the allegations in the complaint in the light most favorable to the non-moving party and takes as true all material allegations in the complaint. *Sanders v. Kennedy*, 794 F.2d 478, 481 (9th Cir. 1986). Even under the liberal pleading standard of Rule 8(a)(2), "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing *Papasan v. Allain*,

---

be relevant to prove the Shaw Defendants' defenses, the Court finds that they cannot be fairly considered incorporated into or part of McLaughlin's TAC. Accordingly, the Court did not consider these documents on the motions to dismiss.

478 U.S. 265, 286 (1986)). Rather, a plaintiff must instead allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.

"The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. . . . When a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted). If the allegations are insufficient to state a claim, a court should grant leave to amend, unless amendment would be futile. *See, e.g. Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296 (9th Cir. 1990); *Cook, Perkiss & Lieche, Inc. v. N. Cal. Collection Serv., Inc.*, 911 F.2d 242, 246-47 (9th Cir. 1990).

As a general rule, "a district court may not consider material beyond the pleadings in ruling on a Rule 12(b)(6) motion." *Branch v. Tunnell*, 14 F.3d 449, 453 (9th Cir. 1994), *overruled on other grounds, Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002) (citation omitted). However, documents subject to judicial notice, such as matters of public record, may be considered on a motion to dismiss. *See Harris v. Cnty of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2011). In doing so, the Court does not convert a motion to dismiss to one for summary judgment. *See Mack v. S. Bay Beer Distrib.*, 798 F.2d 1279, 1282 (9th Cir. 1986), *overruled on other grounds by Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104 (1991). "The court need not . . . accept as true allegations that contradict matters properly subject to judicial notice . . . ." *Sprewell v. Golden State Warriors*, 266 F. 3d 979, 988 (9th Cir. 2001).

**B.     Defendants' Motion to Dismiss.**

    **1.     False Claims Act Claim.**

The False Claims Act imposes civil liability on anyone who "knowingly presents" a "fraudulent claim for payment" to the federal government. 31 U.S.C. § 3729(a)(1)(A); *see also United States ex rel. Mateski v. Raytheon Co.*, 816 F.3d 565, 569 (9th Cir. 2016). The False Claims Act "allows private citizens, referred to as 'relators,' to bring fraud claims on the government's behalf against those who have violated the Act's prohibitions." *Silbersher v. Valeant Pharms. Int'l, Inc.*, 89 F.4th 1154, 1158 (9th Cir. 2024) (citing 31 U.S.C. § 3730(b)(1).

1  "If the government declines to proceed, the relator may prosecute the action and, if successful,

2  recover up to thirty percent of the damages. *Id.* at 1158-59 (citing 31 U.S.C. §§ 3730(b)(4),

3  (d)(2)).

4  Defendants argue that McLaughlin's claims are barred by the public disclosure defense to

5  the False Claims Act. Alternatively, Defendants argue that McLaughlin fails to allege his claims

6  with sufficient particularity.

### i. Public Disclosure Bar

The public disclosure bar reflects "Congress's effort 'to encourage suits by whistle-blowers with genuinely valuable information, while discouraging litigation by plaintiffs who have no significant information of their own to contribute.'" *Silbersher*, 89 F.4th at 1159 (quoting *Mateski*, 816 F.3d at 570). The public disclosure bar is set out in 31 U.S.C. § 3730(e)(4)(A), which provides:

> The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed --
>
> (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
>
> (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
>
> (iii) from the news media,
>
> unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

*See* 31 U.S.C. § 3730(e)(4)(A). The statute defines "original source" as:

> an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

31 U.S.C.A. § 3730(e)(4)(B).

The "public disclosure bar is triggered when: "(1) the disclosure at issue occurred through one of the channels specified in the statute; (2) the disclosure was 'public'; and (3) the relator's

4

action is 'based upon' the allegations or transactions publicly disclosed." *United States v. Allergan, Inc.*, 46 F.4th 991, 994 (9th Cir. 2022) (quoting *United States ex rel. Solis v. Millennium Pharms., Inc.*, 885 F.3d 623, 626 (9th Cir. 2018)). Here, the parties do not dispute that the four news articles upon which the Shaw Defendants rely constitute disclosures through a statutorily authorized channel. Nor do they dispute whether the disclosures were public under the statute. Instead, the dispute centers around whether the McLaughlin's action is based upon the allegations or transactions publicly disclosed and, if so, whether McLaughlin sufficiently alleged whether he is an original source under the statute.

### a.  Substantial Similarity.

McLaughlin argues both that the news articles do not sufficiently disclose any fraud by the Shaw Defendants and that any such disclosures are not substantially similar to his allegations. As the Ninth Circuit has explained, the public disclosure bar in the False Claims Act "uses the terms 'allegations' and 'transactions' without defining either term. *Mateski*, 816 F.3d at 570-71 (quoting 31 U.S.C. § 3730(e)(4)(A)). However, the court explained that "[c]ourts have interpreted 'allegation' to refer to a direct claim of fraud, and 'transaction' to refer to facts from which fraud can be inferred." *Id*. at 571. Under the public disclosure bar "[t]he substance of the disclosure . . . need not contain an explicit 'allegation' of fraud, so long as the material elements of the allegedly fraudulent 'transaction' are disclosed in the public domain." *Id*. (quoting *United States ex rel. Found. Aiding The Elderly v. Horizon W., Inc.,* 265 F.3d 1011, 1014 (9th Cir. 2001)). "[O]nce the government knows the essential facts of a fraudulent scheme, it has enough information to discover related frauds." *U.S. ex rel. Lujan v. Hughes Aircraft Co.*, 243 F.3d 1181, 1189 (9th Cir. 2001) (citations omitted). A "natural understanding" of the government's investigation of claims under the False Claims Act is that once the United States becomes "aware of a wide-reaching alleged fraud, . . . , it investigate[s] all of those claims . . . ." *U.S. ex rel. Bennett v. Biotronik, Inc.*, 2016 WL 1587215 at *6 (E.D. Cal. April 20, 2016).

"[F]or a relator's allegations to be based upon a prior public disclosure, the publicly disclosed facts need not be identical with, but only substantially similar to, the relator's allegations." *Solis*, 885 F.3d at 625 (citing *Mateski*, 816 F.3d at 573). Allegations in a complaint

5

are "substantially similar" to a prior disclosure "when the prior public disclosure put the government 'on notice to investigate the fraud before the relator filed his complaint.'" *Id*. (quoting *Mateski*, 816 F.3d at 574).

The first article at issue, "Treasure Island Radiation More Widespread than Reported", states that the California Department of Public Health expressed alarm that "earlier studies showing fewer radioactive sites led to a botched cleanup effort and the potential spread of contaminants both on and off the island." (Dkt. No. 256-1, Ex A.) State regulators had "pressed for details after cleanup workers found radioactive waste in unexpected locations." (*Id*.) As the article further explained, "[s]ince 1993, the Navy has been preparing the site for handoff to the city, which has agreed to pay $105 million for it. To protect the city from future liability, the deal requires a signoff from state health officials. Those officials have raised questions about exposure for residents of the island." (*Id*.) The article noted that a "Navy contractor recently dumped debris from the two training sites into an undisclosed landfill, . . . then declared the training site clean without testing for radiation." (*Id*.) The article also stated that a civilian cleanup worker had been exposed to the maximum radiation dosage allowed under the Nuclear Regulatory Commission guidelines. (*Id*.) Finally, the article explained that state public health officials issued Shaw a notice of violation "for repeatedly digging, piling, spreading and transporting dirt from sites contaminated with toxic chemicals." (*Id*.)

The second article, "Alarming Radiation Levels Found on Treasure Island", also references the notice of violation issued to Shaw:

> very little information has been publicly released on the eight hundred-plus truckloads of radiologically contaminated soil that were shipped off the island in recent years. Shaw Environmental, the Navy's lead private contractor, has received a Notice of Violation from the California Department of Public Health for its failure to properly collect and record this data.

(Dkt. No. 256-2, Ex. B.)

The third article, "Doesn't the Navy know the Boys and Girls Club left toxic Treasure Island?", under the subheading "Why did the little dump truck run away?", details a car tailing a truck hired by Chicago Bridge and Iron, Shaw's predecessor, carting toxic dirt from one site and

6

appearing to attempt to covertly dump the toxic dirt at another site.  (Dkt. No. 256-3, Ex. C.)  The article questions whether what the truck driver was doing was legal and states "[s]peculation is that the driver of the truck and his [Chicago Bridge and Iron] bosses who sent him mean to dump the chemical-rich dirt in secret." (*Id*.)  Then, under the subheading "What the Navy doesn't know", states that the Navy's toxic clean-up director had been in discussions with the Boys and Girls Club and the efforts to clean up the toxic soil by the Club.  However, the site with the Boys and Girls Club is the site where the Chicago Bridge and Iron truck surreptitiously dumped the toxic soil.  (*Id*.)  The article poses questions about why the truck removed radioactive and chemically contaminated soil from one known toxic site and then transported and dumped the soil on a site being cleaned and whether the Navy was aware of this and/or concealed these facts from the public.  (*Id*.)  The article further questions "[w]hat inspired the driver of the truck carrying toxic dirt to evade a tracking vehicle by futilely driving behind a transparent tarpaulin – and, like an ostrich hiding its head in the sand, dump his virulent load?"  (*Id*.)

The fourth article, "Workers Allege Hunters Point Dirt Needs to be Screened for Radiation", was published after McLaughlin filed his first complaint but before he amended his complaint to include Treasure Island.  (Dkt. No. 256-4, Ex. D.)  Therefore, this article is relevant only to McLaughlin's allegations regarding Treasure Island.  The article states that workers are voicing serious concerns about exposure to radiation and whether the soil is being treated for radiological contamination.  (*Id*.)  Sources stated that the soil was being dug up and taken out without being tested for radiation first.  (*Id*.)  Another source stated that workers were not being monitored for potential exposure.  (*Id*.)  An investigative unit observed a truck full of dirt being taken to a landfill that is not authorized to accept radiologically impacted soil.  (*Id*.)

McLaughlin points to paragraph 7 in his TAC to describe the substance of his allegations against the Shaw Defendants.  (Dkt. No. 259 (McLaughlin's Supplemental Brief) at pp.8-12.) McLaughlin alleges that the Shaw Defendants: (1) failed to properly calibrate machines that test radiation levels at Hunters point, (2) failed to test machines, persons and equipment for radiological contamination at Hunters Point, (3) hired underqualified radiological controls technicians for Hunters Point and Treasure Island, (4) altered or falsified radiological

7

measurements at Hunters Point, (5) designed and intentionally failed to correct inadequate surface surveys of radiologically contaminated areas at Hunters Point, and (6) failed to remove identified radioactive contamination on Parcel E-2 and failed to inform the Navy of this radioactive contamination at Hunters Point. (Dkt. No. 61 (TAC) at ¶¶ 7(B), (C), (D), (E), and (J). McLaughlin then summarizes the fraud at Treasure Island to include fraudulently reporting, storing, and shipping radioactive substances at Treasure Island, including by scrubbing radiological records and secretly removing radiological substances. (*Id*. at ¶ 7(K).) At Hunters Point, McLaughlin alleges that the Shaw Defendants also secretly stored and removed radioactive substances in violation of the contractual reporting requirements, including by secretly storing and shipping radioactive substances and scrubbing the records. (*Id*.)

The Court find that these articles disclose that the Navy contractors, including Shaw and its predecessor, Chicago Bridge and Iron, failed to comply with the testing protocols for the radiologically contaminated soil, including by transporting the soil without testing it, failing to protect and test workers, and failing to safely clean and remove the contaminated soil. The articles also imply that these facts were hidden from the Navy, which, if true, would amount to fraud. Although McLaughlin's allegations regarding the testing, removal, and transportation of the soil go into more detail, they are not different in nature from the facts disclosed by the articles. In other words, the Court finds that these articles would have put the Navy on notice to investigate the alleged fraud. Therefore, these allegations are barred by the public disclosure doctrine unless McLaughlin sufficiently alleges that he is an original source.

However, in addition to the allegations described above, McLaughlin also alleges that the Shaw Defendants: (1) failed to implement waste-water removal and treatment systems in the excavation areas near the bay, thus allowing unrestricted drainage of accumulated contaminated water into the San Francisco Bay from Hunters Point; (2) performing trench scanning for radioactive contamination contrary in violation of the plans and procedures by failing to remove water from trenches prior to radiological scanning, scanning over standing water in trenches, and scanning by submerging scanning probes under standing water in trenches on Parcel D-1 at Hunters Point; (3) directing employees to exclude references to the standing water in their work

8

1  reports submitted to the Navy for Hunters Point; (4) breaking down barriers that block the

2  radiological and chemical contaminated water from entering the San Francisco Bay in violation of

3  the legal and contractual obligations; and (5) disregarding OSHA safety standards on the handling

4  and disposal of asbestos at Hunters Point.  (Dkt. No. 61 at ¶¶ 7(A), (F), (H), and (I).  The Court

5  finds that these allegations are not sufficiently similar to the facts disclosed by the above articles.

6  The Court, thus, holds that McLaughlin's allegations regarding water and asbestos are not barred

7  by the public disclosure doctrine.

### b.    Original Source.

9  With respect to the allegations that the Court finds were disclosed by the articles,

10  McLaughlin can only bring his false claim act based on these allegations if he alleges sufficient

11  facts which, if true, would demonstrate that he was an "original source."  The statute defines an

12  "original source" as an individual who voluntarily discloses to the Government the information on

13  which the allegations or transactions in a claim are based before the information was publicly

14  disclosed.  *See* 31 U.S.C. § 3730(e)(4)(B)(i).  Alternatively, an individual is considered an

15  "original source" if he or she has knowledge that is "is independent of and materially adds to the

16  publicly disclosed allegations or transactions" and voluntarily provides this the information to the

17  Government before filing the false claim act lawsuit.  *See* 31 U.S.C. § 3730(e)(4)(B)(ii).

18  To be an "original source", the individual must have "true knowledge" of the fraudulent

19  scheme, "as opposed to guesswork or suspicion[.]"  *Prather v. AT&T, Inc.*, 847 F.3d 1097, 1104

20  (9th Cir. 2017).  McLaughlin alleges generally that he worked at Hunters Point from June 2010 to

21  August 2012 for Shaw and that he was assigned to oversee soil sampling, packaging, and

22  documenting soil sampling.  (Dkt. No. 61 at ¶ 12.)  He further alleges generally that he observed

23  "numerous improper practices that had the potential to lead to the release of toxic materials into

24  the surrounding environment".  (*Id*.)  He explains that he and his counsel have also conducted

25  independent investigations that have "revealed false statements and false claims for payment

26  involving remediation."  (*Id*.; *see also id.* at ¶ 251 (alleging generally that McLaughlin's

27  knowledge obtained "through his own investigation and that of his agents" that is independent of

28  and adds to the public information regarding "false work" and that he disclosed this information to

the government before filing his First Amended Complaint).) These generalized allegations are woefully inadequate to set forth sufficient facts to show what specifically McLaughlin knew and when he disclosed such facts to the government. In the absence of such allegations, McLaughlin fails to allege that he disclosed the facts underlying the allegations or transactions disclosed by the articles *before* the articles were published or that he had knowledge that was independent of and materially added to the publicly disclosed allegations or transactions that he disclosed to the government *before* filing his complaint.[2] Thus, McLaughlin's allegations regarding failures to properly calibrate machines, (2) failing to test machines, persons and equipment for radiological contamination, hiring underqualified radiological controls technicians, altering or falsifying radiological measurements, designing inadequate surface surveys of radiologically contaminated areas, failing to remove identified radioactive contamination, and fraudulently reporting, storing, and shipping radioactive substances as summarized in paragraphs 7(B), (C), (D), (E), (J), and (K) in his TAC are barred by the public disclosure doctrine. However, despite the age of this case and the number of times McLaughlin has already amended, the Court will provide McLaughlin with *one* last opportunity to amend his allegations.

### ii. Failure to State a Claim.

As discussed above, the Court finds that McLaughlin's allegations regarding water and asbestos are not barred by the public disclosure doctrine. Therefore, the Court will address whether McLaughlin sufficiently alleges his False Claims Act claim to the extent it is premised on his allegations regarding water and asbestos.

Defendants argue that Plaintiff fails to allege sufficient facts to state a claim under the False Claims Act. To state a claim under the False Claims act, a relator must allege: "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing

---

[2] McLaughlin filed a declaration from his counsel to further describe in a general manner the timing and substance of what was disclosed to the government. (Dkt. No. 259-1 (Declaration of David Anton).) However, the Court may not consider these factual statements on a motion to dismiss. Additionally, the Court notes that McLaughlin's counsel describes personal interviews that counsel conducted. McLaughlin does not provide any authority that information discovered by *counsel* may be attributed to McLaughlin to support his "original source" allegations. Nevertheless, because the Court finds that McLaughlin's allegations in his TAC are insufficient, the Court need not determine at this time whether a *counsel's* knowledge may be considered.

10

(4) the government to pay out money or forfeit moneys due." *United States Ex Rel. Rose v. Stephens Inst.*, 909 F.3d 1012, 1017 (9th Cir. 2018).

"Evidence of an actual false claim is 'the *sine qua non* of a False Claims Act violation.'" *United States ex rel. Aflatooni v. Kitsap Physicians Serv.*, 314 F.3d 995, 1002 (9th Cir. 2002); *see also United States ex rel. Cafasso, v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) ("It seems to be a fairly obvious notion that a False Claims Act suit ought to require a false claim. The FCA attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the claim for payment." (cleaned up) (quotation marks and citations omitted).

Moreover, an entity's "misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 192 (2016). "The materiality standard is demanding." *Id*. at 194; *see also id*. at 195 n.6 (describing materiality standard as "rigorous"). As the Supreme Court explained:

> A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment. Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance. Materiality, in addition, cannot be found where noncompliance is minor or insubstantial. . . .

*Id*. at 194.

With respect to scienter, "[t]he requisite intent is the knowing presentation of what is known to be false, as opposed to innocent mistake or mere negligence. Bad math is no fraud, proof of mistakes is not evidence that one is a cheat, and the common failings of engineers and other scientists are not culpable under the Act." *United States v. Bourseau*, 531 F.3d 1159, 1167 (9th Cir. 2008) (internal quotation marks and citations omitted).

Upon review of the TAC, the Court finds that McLaughlin fails to allege with sufficient particularity what the alleged false statements were, that they were made with scienter, and that they were material to Shaw being paid by the Navy. Although McLaughlin goes into detail as to Shaw's alleged flaws with the work it conducted for the Navy, it is not clear what and/or when

1  Shaw certified its compliance with the environmental statutes, whether it was done with the
2  requisite scienter, and what was material to the Navy's payments to Shaw.  Additionally, because
3  the TAC includes allegations against other defendants, addresses projects at two different
4  locations, and asserts multiple alleged environmental problems, including those the Court finds are
5  barred by the public disclosure doctrine, the TAC is cumbersome and very difficult to follow.
6  Again, although McLaughlin has already had multiple opportunities to amend his allegations, the
7  Court will provide *one more* opportunity to file an amended pleading.

### 2. Retaliation.

9  The False Claims Act protects employees from being "discharged, demoted, . . . or in any
10 other manner discriminated against in the terms and conditions of employment . . . because of
11 lawful acts done by the employee . . . in furtherance of an [FCA] action . . . ." 31 U.S.C. §
12 3730(h).  To bring a retaliation claim under the False Claims Act, a plaintiff must allege the
13 following three elements: "(1) the employee must have been engaging in conduct protected under
14 the Act; (2) the employer must have known that the employee was engaging in such conduct; and
15 (3) the employer must have discriminated against the employee because of her protected conduct."
16 *United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.,* 637 F.3d 1047, 1060 (9th Cir. 2011)
17 (quoting *U.S. ex rel. Hopper v. Anton*, 91 F.3d 1261, 1269 (9th Cir. 1996)).  While "[s]pecific
18 awareness of the FCA is not required[,] . . .the plaintiff must be investigating matters which are
19 calculated, or reasonably could lead, to a viable FCA action." *Hopper,* 91 F.3d at 1269.  Merely
20 investigating an employer's noncompliance with state or federal regulations is insufficient to state
21 a claim for retaliation under the FCA. *See id*.  "To be covered by the False Claims Act, the
22 plaintiff's investigation must concern 'false or fraudulent' claims." *U.S. ex rel. Yesudian v.*
23 *Howard Univ.*, 153 F.3d 731, 740 (D.C. Cir. 1998) (quoting 31 U.S.C. § 3729(a); citing *Hopper,*
24 91 F.3d at 1269.)  While McLaughlin's TAC does contain a couple of references to complaints he
25 made to Shaw, those complaints concerned Shaw's failure to comply with environmental or
26 contractual obligations and do not reference any fraudulent claims to the Navy.  Accordingly,
27 McLaughlin fails to allege facts sufficient to state a claim for retaliation under the False Claims
28 Act.  Again, the Court will provide McLaughlin with *one* more opportunity to amend his claims.

### 3. Derivative State-Law Claims

The Shaw Defendants argue that because McLaughlin failed to adequately plead a claim for retaliation under the False Claims Act, that McLaughlin's state-law claims for termination in violation of public policy and violation of the California Labor Code § 1102, which are both premised on retaliation, fail as well. McLaughlin does not dispute that these state-law claims fail if he fails to adequately allege a claim for retaliation under the False Claims Act. Instead, McLaughlin merely argues that his retaliation claim under the False Claims Act is sufficiently pled. (Dkt. No. 139 at p. 25.) Because the Court finds that McLaughlin has not plead facts sufficient to state a claim for retaliation under the False Claims Act, McLaughlin's derivative state-law claims, thus, fail as well. However, as discussed above, the Court is providing McLaughlin with *one* more opportunity to amend his complaint.

### 4. Successor-in-Interest

The Shaw Defendants argue that McLaughlin fails to allege sufficient facts as to Chicago Bridge and Iron Company, Aptim Federal Services, LLC, and Aptim Corporation to hold them liable as successors in interest to Shaw. As the Ninth Circuit explained, a company that purchases the assets of another company is not liable as a successor in interest, unless:

> (1) The purchasing corporation expressly or impliedly agrees to assume the liability;
>
> (2) The transaction amounts to a "de-facto" consolidation or merger;
>
> (3) The purchasing corporation is merely a continuation of the selling corporation; or
>
> (4) The transaction was fraudulently entered into in order to escape liability.

*Atchison, Topeka & Santa Fe Ry. Co. v. Brown & Bryant, Inc.*, 159 F.3d 358, 361 (9th Cir. 1997). In response, McLaughlin appears to argue that he sufficiently alleged a transaction between Shaw and the other companies that amounts to a merger. However, McLaughlin fails to point to *any* allegations in his TAC to support this argument. Therefore, the Court finds that McLaughlin fails to allege facts which, if true, would be sufficient to hold Chicago Bridge and Iron, Aptim Federal Services, LLC, or Aptim Corporation liable for Shaw's conduct. Again, the Court will provide McLaughlin with *one* more opportunity to amend his allegations.

13

**CONCLUSION**

For the foregoing reasons, the Court GRANTS the Shaw Defendants' motion to dismiss but is providing McLaughlin with leave to amend. If he elects to file a fourth amended complaint, McLaughlin should take care to carefully plead only those facts that are relevant to the Shaw Defendants and to plead the relevant facts in a more streamlined fashion. While McLaughlin needs to allege additional information regarding what the Navy knew when, what McLaughlin disclosed to the Navy, and about what McLaughlin complained to the Shaw Defendants, McLaughlin need not go into such detail about every alleged mistake, error, or misconduct purportedly committed by the Shaw Defendants. The Court notes that McLaughlin's TAC is 119 pages and contains 316 paragraphs, many of which have multiple subparts. Pleading in such excessive detail makes the complaint overly cumbersome and very difficult to follow.

The Court HEREBY SETS a Further Case Management Conference for March 18, 2025 at 1:30 p.m. The parties shall file an updated joint case management statement by no later than March 11, 2025.

**IT IS SO ORDERED**.

Dated: November 19, 2024

*Sallie Kim*
SALLIE KIM
United States Magistrate Judge